**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES SHIRD, personal representative of
the Estate of Kevin Carlton Hargraves Shird,

     *Plaintiff*,

     v.

REINALDO OTERO-CAMACHO,

     *Defendant*.

Case No. 1:25-cv-00008 (CRC)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT OTERO-CAMACHO'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION**....................................................................................................................... 1

**STATEMENT OF FACTS**........................................................................................................ 2

**LEGAL STANDARD** ............................................................................................................... 4

**ARGUMENT**............................................................................................................................. 5

    I.   Qualified Immunity Bars Excessive Force ................................................................... 5

        A.  No Clearly Established Right Was Violated ............................................................ 6
        B.  The Force Was Objectively Reasonable................................................................. 10

    II.  Supplemental Jurisdiction Over the Common Law Claims............................................ 13

    III. Qualified Privilege Bars the Battery Count .................................................................. 14

    IV. Plaintiff's Negligence Count Fails................................................................................. 16

        A.  Plaintiff Failed to Established the Standard of Care for Negligence...................... 16
        B.  Plaintiff Cannot Show Causation as a Matter of Law. ........................................... 19
        C.  *Chinn* Bars the Negligence Count ...................................................................... 21
        D.  Shird Was Contributorily Negligent as a Matter of Law........................................ 22

    V.  Wrongful Death and Survival Act are not Independent Claims ..................................... 23

**CONCLUSION** ....................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) .................................................................... 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 4, 5

*Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) ........................................................................ 7

*Barnes v. Felix*, 605 U.S. 73 (2025) .............................................................................. 13

*Bushrod v. District of Columbia*, 521 F.Supp. 3d 1 (D.D.C. 2021).................. 8, 9, 11, 15

*Buruca v. District of Columbia*, 902 F. Supp. 2d 75 (D.D.C. 2012) ............................. 23

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ............................. 17, 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 4

*Clark v. District of Columbia*, 708 A.2d 632 (D.C. 1997) ............................... 16, 17, 19

*Chen v. ICS Protective Servs.*, No. 23-CV-01253 (DLF), 2024 WL 4103700 (D.D.C. Sept. 5, 2024).................................................................................................................... 15

*Cherry v. District of Columbia*, 330 F.Supp. 3d 216 (D.D.C. 2018) ........................... 23

*Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001)............................................................ 7

*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003)...................................... 21, 22

*District of Columbia v. Evans*, 644 A.2d 1008 (D.C. 1994)............................................ 5

*District of Columbia v. Walker*, 689 A.2d 40 (D.C. 1996) ........................................... 18

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ....................................................... 6

*Doe v. District of Columbia*, 796 F.3d 96 (D.C. Cir. 2015) ........................................... 7

*Dukore v. District of Columbia*, 799 F.3d 1137 (D.C. Cir. 2015) .................................. 7

*Evans-Reid v. District of Columbia*, 930 A.2d 930 (D.C. 2007) .................................. 15

*Felton v. Wagner,* 512 A.2d 291 (D.C.1986) ................................................................ 23

*Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840 (D.C. Cir. 2001) ............................ 5

*Graham v. Connor*, 490 U.S. 386 (1989) ...................................................... 11, 16, 17

*Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007) ........................ 20, 21

*Hunter v. Bryant*, 502 U.S. 224 (1991)........................................................................... 5

*Jackson v. District of Columbia*, No. 23-CV-922 (CRC), 2024 WL 2131761 (D.D.C. May 13, 2024)........................................................................................................................ 18

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010) ......................................... 10

*Jiggetts v. Cipullo*, No. CV V17-380 (JMC), 2025 WL 9583115 (D.D.C. Mar. 31, 2025) ......... 22

*Kisela v. Hughes*, 584 U.S. 100 (2018)............................................................................ 7

*Leach v. District of Columbia et al.*, No. 19-CV-00947 (APM), 2025 WL 3715006 (D.D.C. Dec. 23, 2025)............................................................................................... 14, 15, 16

*Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981 (7th Cir. 2021) ..................................... 10

*Majeska v. District of Columbia*, 812 A.2d 948 (D.C. 2002) ...................................... 20

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................... 7

*Marsh v. Bewley*, No. 24-CV-683 (RDM), 2025 WL 947518 (D.D.C. Mar. 28, 2025) ............. 22

*McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708 (D.C. 1991) .................... 19

*Messina v. District of Columbia*, 663 A.2d 535 (D.C. 1995) ............................... 17, 19

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...................................................................... 6

*Mullenix v. Luna*, 577 U.S. 7 (2015)........................................................................... 5, 7

*Musgrove v. District of Columbia*, 775 F. Supp. 2d 158 (D.D.C. 2011) ....................................... 4

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................................................ 5

*Plumhoff v. Rickard,* 572 U.S. 765 (2014)................................................................................. 6

*Rawlings v. District of Columbia,* 820 F. Supp. 2d 92 (D.D.C. 2011*)* ........................................ 17

*Rice v. District of Columibia*, 715 F. Supp. 2d 127 (D.D.C. 2010)............................................... 18

*Rich v. District of Columbia*, 715 F. Supp. 2d 127 (D.D.C. 2010)................................................ 19

*Ridgeway v. City of Woolwick Twp. Police Dep't*, 924 F. Supp. 653 (D.N.J. 1996)............. 12, 13

*Rogala v. District of Columbia*, 161 F.3d 44 (D.C. Cir. 1998)..................................................... 15

*Sabir v. District of Columbia*, 755 A.2d 449 (D.C. 2000)........................................................... 22

*Saucier v. Katz*, 533 U.S. 194 (2001) ...................................................................................... 6, 7

*Scales v. District of Columbia*, 973 A.3d 722 (D.C. 2009) .................................................. 5, 14, 16

*Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996) ..................................................... 17

*Scott v. Harris*, 550 U.S. 372 (2007) ...................................................................................... 4, 10

*Sherrod v. McHugh*, 334 F.Supp. 3d 219 (D.D.C. 2018) ............................................................. 17

*Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985 (8th Cir. 2020)..................... 9, 10

*Stotmeister v. Alion Sci. & Tech. Corp.*, 65 F.Supp. 3d 56 (D.D.C. 2014)............................. 22, 23

*Taylor v. Barkes*, 575 U.S. 822 (2015) ...................................................................................... 6

*Tennessee v. Garner*. 471 U.S. 1 (1985)................................................................................. 11, 17

*Toy v. District of Columbia*, 549 A.2d 1 (D.C. 1988) ................................................................. 19

*United States v. Jackson*, 652 F.2d 244 (2d Cir.) ...................................................................... 7

*United States Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351 (2d Cir. 1993) ........................... 22

*United States v. White*, 648 F.2d 29 (D.C. Cir. 1981) ................................................................. 11

*Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) ........................................................ 16

*Washington Metro. Area Transit Auth. v. Young*, 731 A.2d 389 (D.C. 1999).............................. 23

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002) ........................................... 4

*Wheeler v. Am. Univ.*, 619 F Supp. 3d 1 (D.D.C. 2022)............................................................. 17

*White v. Pauly*, 580 U.S. 73 (2017) ........................................................................................... 5

*White v. United States*, 863 F.Supp. 2d 41 (D.D.C. 2012) ..................................................... 11, 12

*White v. Washington Nursing Facility*, 206 F.Supp.3d 137 (D.D.C. 2016) ............................... 4, 8

*Wolfe v. United States Dep't of Homeland Sec.*, No. 19-5330, 2020 WL 7017861 (D.C. Cir. Sept. 17, 2020) ................................................................................................................................ 15

*Woolridge Mfg. Co. v. United States*, 235 F.2d 513 (D.C. Cir. 1956) ......................................... 21

*Young v. Scales*, 873 A.2d 337 (D.C. 2005) ............................................................................... 5

**Statutes**

28 U.S.C. § 1331.................................................................................................................. 13, 14

18 DCMR § 2000.2................................................................................................................... 20

18 DCMR § 2201.1.............................................................................................................. 10, 11

***Rules***

*Fed. R. Civ. P. 56*..................................................................................................................... *1*

*Fed. R. Civ. P. 56(a)* ................................................................................................................. *4*

*Fed. R. Civ. P. 56(c)(1)(A)*........................................................................................................ *4*

**Other Authorities**

2 Restatement, Torts, § 281 (1934) ........................................................................................ 21

## INTRODUCTION

The case arises from an incident when Reinaldo Otero-Camacho (Sgt. Otero-Camacho). fatally shot Kevin Carlton Hargraves Shird (Shird), Plaintiff's son, on July 30, 2022. Am. Compl. [1-10]. Sgt. Otero-Camacho did so after he pursued Shird's vehicle, believing it was connected to a nearby shooting. Shird drove against traffic on Georgia Avenue, then fled with Sgt. Otero-Camacho's pursuing, marked police cruiser behind him, ignoring its blaring siren, turned the wrong way down Madison, a residential, one-way street, and then immediately crashed into a curb with a tire-screeching halt. Shird exited his car, but then delayed his escape to retrieve something from inside as Sgt. Otero-Camacho pulled up behind Shird's car. As Sgt. Otero-Camacho exited his police cruiser he held an objectively reasonable belief Shird was armed with a gun. Shird then sprinted away from Sgt. Otero-Camacho and into a park close to a bounce house with children and adults present. Sgt. Otero-Camacho shouted: "GUN! GUN! GUN! GUN! GUN!" But Shird did not stop. Fearing for the safety of the bystanders and himself, Sgt. Otero-Camacho used force to stop Shird.

All five claims fail at summary judgment: 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment (Count I); wrongful and negligent conduct under the Survival Act, D.C. Code § 12-101 (Count II); common law negligence under the Wrongful Death Act, D.C. Code § 16-2701 (Count III); battery (Count IV); and negligence (Count V). *See generally* Am. Compl. [1-10].

*First*, qualified immunity shields Sgt. Otero-Camacho from liability for shooting someone he believed had a gun and who was running from a uniformed officer in the area of a party with children and families, a rapidly evolving and dangerous situation with potentially catastrophic consequences for those innocent bystanders and for Sgt. Otero-Camacho. No prior

decision would have put Sgt. Otero-Camacho on notice that taking action to protect the community in that manner violated a clearly established right. Thus, the shooting was objectively reasonable as a matter of law.

*Second*, the Court should exercise supplemental jurisdiction over the common law claims and dismiss them.

*Third*, the qualified privilege for intentional torts bars liability for battery for the same reasons that qualified immunity shields against the constitutional claim.

*Fourth*, the negligence count fails for four independent reasons: (1) Plaintiff has not established the standard of care; (2) no negligence by Sgt. Otero-Camacho proximately caused Shird's death through the intentional shooting; (3) Plaintiff cannot simultaneously pursue battery and negligence based on the same conduct; and (4) Shird's own contributory negligence, by recklessly fleeing a marked police cruiser, and then continuing that flight on foot while ignoring a uniformed police officer who was shouting "GUN! GUN! GUN! GUN! GUN!" and running into a crowded park bar this claim.

*Finally*, Wrongful Death Act and Survival Act claims do not stand alone. As no other claims survive, these claims also fail. Thus, summary judgment in favor of Sgt. Otero-Camacho is appropriate for all counts.

## STATEMENT OF FACTS

On July 30, 2022, Sgt. Otero-Camacho was on duty, in full police uniform, and equipped with a body worn camera. Sgt. Otero-Camacho's Statement of Undisputed Material Facts (SUMF) ¶ 1. Sgt. Otero-Camacho responded to a call for backup related to a shooting in a different block. *Id*. ¶ 2. Sgt. Otero-Camacho was the driver of a marked Metropolitan Police Department cruiser to respond to that shooting. *Id*. ¶ 3.

2

While Sgt. Otero-Camacho was on route, he heard officers broadcast a lookout for a white sedan leaving the shooting scene. *Id*. ¶ 4. Sgt. Otero-Camacho then observed a white Kia Optima sedan (Kia Optima) at an intersection moving against traffic. *Id*. ¶¶ 5–6. Sgt. Otero-Camacho considered the Kia Optima as potentially being the vehicle involved in the shooting moments before. *Id*. ¶ 7. Sgt. Otero-Camacho concluded the occupants may therefore be armed. *Id*. ¶ 8.

Sgt. Otero-Camacho pulled behind the Kia Optima with the cruiser's siren activated. *Id*. ¶ 9. The Kia Optima did not immediately stop. *Id*. ¶ 10. The Kia Optima stopped about one minute later after turning the wrong way onto Madison Street, a residential, one-way street, when it came to a tire-screeching halt and struck a curb. *Id*. ¶¶ 11, 23, 44. Three unknown males then fled the Kia Optima exiting it and running away. *Id*. ¶ 12.

Shird was the driver of the Kia Optima. *Id*. ¶ 13. Shird did not flee with the other three occupants. *Id*. ¶ 14. Instead, Shird exited the Kia Optima as Sgt. Otero-Camacho's marked police cruiser turned onto Madison Street. *Id*. ¶ 15. Shird then reached back into the Kia Optima before running into Fort Slocum Park. *Id*. ¶¶ 16, 18.

After Shird reached into the Kia Optima, Sgt. Otero-Camacho believed Shird had a gun. *Id*. ¶ 17.  Shird then ran into Fort Slocum Park, close to a gathering with children and adults at a bounce house. *Id*. ¶¶ 18–19. Sgt. Otero-Camacho had safety concerns for those children and adults, as well as for himself. *Id*. ¶ 20. Sgt. Otero-Camacho yelled, "GUN! GUN! GUN! GUN! GUN!" *Id*. ¶ 21. Sgt. Otero-Camacho shot one time at Shird, fatally striking him. *Id*. ¶ 22. The time elapsed between when Sgt. Otero-Camacho put his cruiser in park and exited the cruiser to firing on Shird was three seconds. *Id*. ¶ 24.

After Shird was down, Sgt. Otero-Camacho located a gun in the grass in close proximity to Shird's body. *Id.* ¶ 25.

## LEGAL STANDARD

Fed. R. Civ. P. 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). A fact is "material" if it can affect the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists so that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is designed to streamline litigation by disposing unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the burden to identify portions of the record showing the lack of any genuine issue of material fact. *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant may cite "depositions, documents, electronically stored information, affidavits or declarations, … admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly identify record support for a genuine issue suitable for trial. *Celotex*, 477 U.S. at 324.

The non-movant's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Musgrove v. District of Columbia*, 775 F. Supp. 2d 158, 164 (D.D.C. 2011) (citing Fed. R. Civ. P. 56(c)(1), and *Celotex*, 477 U.S. at 324). Thus, overcoming summary judgment requires more than "a scintilla of

4

evidence to support his claims." *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citation modified).

## ARGUMENT

### I.    Qualified Immunity Bars Excessive Force.

Sgt. Otero-Camacho is entitled to qualified immunity for this Fourth Amendment claim based on excessive force. Qualified immunity "shields government officials performing discretionary functions from liability for damages in actions brought under 42 U.S.C. § 1983 provided their conduct does not violate clearly established federal constitutional or statutory rights of which a reasonable person would have known." *Young v. Scales*, 873 A.2d 337, 341 (D.C. 2005). It "protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal quotation marks omitted). "[P]olice officers should not be hindered by the threat of civil liability from attempting to perform their duties to the best of their abilities, as long as they are not violating clearly defined, firmly established constitutional rights." *District of Columbia v. Evans*, 644 A.22d 1008, 1016 (D.C. 1994).

Qualified immunity involves a two-step inquiry, done in any order. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). It asks (1) whether the plaintiff has sufficiently alleged or shown that the officer violated a constitutional or statutory right; and (2) whether the violated right was clearly established at the time of the violation. *Id.* If either answer is no, the officer is entitled to qualified immunity. *Scales v. District of Columbia*, 973 A.3d 722, 727 (D.C. 2009).

Summary judgment is an appropriate posture to decide qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Qualified immunity is ". . . an *immunity from suit* rather than a

5

mere defense to liability; … it is effectively lost if a case is erroneously permitted to go to trial."
*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). In deciding qualified
immunity, "[a]ll [the court] need determine is a question of law: whether the legal norms
allegedly violated by the defendant were clearly established at the time of the challenged actions
or . . . . whether the law clearly proscribed the actions the defendant claims he took." *Id.* at 528.
Plaintiff's claim fails both prongs of the qualified immunity analysis. No clear precedent
rendered Sgt. Otero-Camacho's force in these specific circumstances unconstitutional before
July 30, 2022. And the undisputed facts establish Sgt. Otero-Camacho's use of force was
objectively reasonable under the circumstances. Thus, he is entitled to qualified immunity.

A.     **No Clearly Established Right Was Violated.**

An officer is entitled to qualified immunity "unless it is shown" that he "violated a
statutory or constitutional right that was clearly established at the time of the challenged
conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (internal quotation marks omitted).
The relevant right must be clear from "a controlling case or robust consensus of cases." *District
of Columbia v. Wesby*, 583 U.S. 48, 65 (2018). The inquiry is specific to the context of the case
rather than general propositions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right "must have
been 'clearly established' in a more particularized, and hence more relevant, sense: The contours
of the right must be sufficiently clear that a reasonable official would understand that what he is
doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (2001));
s*ee also Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (a right is "clearly established" if it is
"sufficiently clear that every reasonable official would have understood that what he is doing
violates that right.") (internal quotation omitted). "In other words, existing law must have placed
the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting

6

*Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The clearly established prong ordinarily requires "a Supreme Court or [] Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)). "Law enforcement personnel are therefore 'entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Id*. (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). The specificity of the rule is "especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier*, 533 U.S. at 205) (reversing denial of qualified immunity because constitutionality not "beyond debate").

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104–05 (quoting *Mullenix*, 577 U.S. at 12). The plaintiff has the "burden to show that the particular right in question—narrowly described to fit the factual pattern confronting the [official]—was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted).

Plaintiff cannot meet this burden. Sgt. Otero-Camacho reasonably believed Shird's car was fleeing the scene of a shooting, and also that Shird was running with a gun through a

7

crowded park of children and adults to flee a uniformed police officer. SUMF ¶¶ 1–25, 44.

Taking one fatal shot to protect children, adults, and himself under these circumstances did not

violate a clearly established Fourth Amendment right. *Id*. Neither the Supreme Court nor the

D.C. Circuit has found a Constitutional violation when analyzing a materially similar fact

pattern.

There are no cases that squarely fit the fact pattern in this case, so there is no clearly

established right. The scenario in *Bushrod v. District of Columbia* is somewhat similar and

reflects the constitutionality of Sgt. Otero-Camacho's conduct. *See* 521 F. Supp. 3d 1, 27–29

(D.D.C. 2021). And it illustrates the lack of a clearly established constitutional violation.

*Bushrod* involved a police shooting/excessive force claim on a motion for summary judgment.

*Id.* at 9–10. MPD officers saw Bushrod driving and recognized him as someone they previously

arrested for driving without a valid license and expired registration. *Id.* at 9. The officers, after

confirming the registration remained expired, followed Bushrod's car to pull him over. *Id.*

Bushrod alleged he did not realize the officers were attempting to pull him over. *Id.* at 9. When

Bushrod stopped at an intersection, the officers, with guns drawn, demanded he exit the car, and

one officer reached into Bushrod's car for the keys. *Id.* When Bushrod tried to drive away, the

officer jumped back and shot him without warning. *Id.* at 10. The officer claimed he "feared for

his life and that he was in risk of severe bodily harm . . . ." *Id.*

Qualified immunity shielded that officer under both prongs of the qualified immunity

test. That is, the force was objectively reasonable, and Bushrod did not meet "[his] burden to

show that a right in question was clearly established." *Id.* at 21. Bushrod did not identify

"controlling authority" or a "robust consensus cases of persuasive authority," thereby failing the

second prong. *Id.*

8

Sgt. Otero-Camacho similarly violated no clearly established right. As in *Bushrod*, the encounter between Sgt. Otero-Camacho and Shird originated with a chase. And there are aggravating factors here not found in *Bushrod*. Bushrod was not armed, nor was there a reasonable basis to believe he was armed. *See generally, Bushrod* 521 F. Supp. 3d at 9–11. Sgt. Otero-Camacho responded for a shooting—not just an expired license and registration—and tried to stop an individual he considered to have a gun. SUMF ¶¶ 2–10, 17. Throughout the encounter, Shird showed no regard for the safety of the public or Sgt. Otero-Camacho. *Id.* ¶¶ 6, 11, 17–19. He not only rebuffed Sgt. Otero-Camacho's attempt to carry out a stop but drove the wrong direction down Georgia Avenue, made a screeching turn the wrong way onto Madison Street, and then fled through a crowded park despite a uniformed police officer shouting "GUN! GUN! GUN! GUN! GUN!" *Id*. ¶¶ 6, 10–21, 44. Sgt. Otero-Camacho sought to protect not only his own safety, but the safety of children and adults at the park. *Id*. ¶¶ 20–22.  Like in *Bushrod*, no case decided before July 30, 2022, showed this action violated a clearly established right.

Cases from other Circuits reinforce this conclusion. For example, the Eight Circuit Court of Appeals considered officers entitled to qualified immunity where an officer shot and killed a fleeing suspect. *See Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 990 (8th Cir. 2020). Three officers fired 23 bullets at Map Kong after he exited his vehicle with a knife and ran across a parking lot away from the officers toward a frontage road and highway. *Id.* at 990. A vehicle was exiting the parking lot about 30 feet away and there were a few cars passing along the frontage road about 100 feet away. *Id.* The steady flow of vehicles through the parking lot meant people could quickly approach. *Id.* at 993. ". . .Kong's unpredictable behavior with his weapon made him dangerous even if he had not yet harmed anyone." *Id.* at 994. Qualified immunity shielded against liability because no clearly established law showed that this shooting

9

violated a constitutional right where the decedent posed a threat to citizens by running away from police with a knife through a parking with citizens in the vicinity. *Id. See also Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 990 (7th Cir. 2021) (granting qualified immunity where "Lopez cannot point to a case that clearly establishes a reasonable officer cannot use lethal force over the span of three seconds on an individual he had just seen fire his weapon, who has not surrendered, and is still moving to evade capture."); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (qualified immunity granted for an officer who shot armed "suspect of violent crimes who had attempted to elude" because officer not required to "wait 'and hope[ ] for the best.'" (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)).

Sgt. Otero-Camacho acted to protect children, adults, and himself while attempting an arrest. Like the officers in *Sok Kong,* Sgt. Otero-Camacho was protecting children and adults from an unpredictable individual believed to be running with a weapon. *See* SUMF ¶¶17–22. Those at risk—children enjoying a party in a park with a bounce house—were arguably more vulnerable than the pedestrians at risk in *Sok Kong*. *See id.* ¶¶ 19–21. Shird showed himself to be an unpredictable, dangerous fleer. He fled police with emergency equipment activated. *Id.* ¶ 9–10. He twice violated District traffic laws by driving the wrong way down two streets until he crashed into a curb. *Id.* ¶¶ 6, 11; *see* 18 DCMR § 2201.1. Sgt. Otero reasonably believed Shird had a gun, making him more dangerous than someone with a knife. *Id.* ¶¶ 7–8, 14–17, 21, 23–25. If the action taken by officers in *Sok Kong* was not "beyond debate," *Sok Kong*, 960 F.3d at 992, Sgt. Otero-Camacho could not have known his conduct undoubtedly exceeded an acceptable use of force under the Fourth Amendment. With no clearly established right violated, Sgt. Otero-Camacho has qualified immunity.

B.     **The Force was Objectively Reasonable.**

10

The Fourth Amendment claim also fails under the first prong of the qualified immunity analysis. Force does not violate the Fourth Amendment if the officer's actions were objectively reasonable given the facts and circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The officers' reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* Deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Reasonableness accounts for "the totality of the circumstances." *Bushrod*, 521 F. Supp. 3d. at 24 (citing *Graham*, 490. U.S. at 396). Here, Sgt. Otero-Camacho reasonably believed Shird posed a threat of serious physical harm to children, adults, and himself. His use of deadly force met the standard established by *Tennessee v. Garner*. SUMF ¶¶ 8, 11–21.

*First*, Sgt. Otero-Camacho reasonably believed Shird was engaged in dangerous, felony-level misconduct. Sgt. Otero-Camacho was responding to a look-out call for a recent shooting where two victims were struck by gunfire. *Id*. ¶¶ 2–3. Shird's car matched the description of the vehicle fleeing the shooting, so Sgt. Otero-Camacho activated emergency equipment to pull over the car. *Id*. ¶¶ 4–9. Shird did not stop; he drove the wrong way on Georgia Avenue and then turned the wrong way down Madison Street before crashing into a curb. *Id*. ¶¶ 6, 10–11.

*Second*, Shird never surrendered to the police. *Id*. ¶¶ 10–24. He did not stop the Kia Optima when Sgt. Otero-Camacho activated his sirens; instead, he drove erratically, disregarding traffic laws. *Id*. ¶¶ 6, 9–11, 44; 18 DCMR § 2201.1. Once he crashed into the curb, Shird

11

continued to defy police by running through the crowded park despite Sgt. Otero-Camacho yelling "GUN! GUN! GUN! GUN! GUN!" *Id*. ¶¶ 18, 21.

*Finally*, Sgt. Otero-Camacho reasonably believed Shird to be armed. *Id*. ¶¶ 8, 14–17. Upon hitting the curb, three unknown males exited the Kia Optima and ran through the park. *Id*. ¶ 12. But instead of running with the other fleeing occupants, Shird went back for something in the car. *Id*. ¶ 14. Sgt. Otero-Camacho believed Shird was involved in and fleeing a near-by shooting, giving him reason to believe Shird was arming himself with a gun. *Id*. ¶¶ 8, 17–22. Instead of giving himself a headstart toward escape, Shird was willing to delay his escape. *Id*. ¶¶ 14–17. Under these circumstances, Sgt. Otero-Camacho reasonably believed Shird was armed and may use deadly force to aid his escape. *Id*. ¶¶ 20–21.

These quickly evolving circumstances shaped Sgt. Otero-Camacho's perception of the grave danger from Shird. The encounter lasted only 1 minute and 3 seconds from when Sgt. Otero-Camacho pulled the police cruiser behind Shird's fleeing Kia Optima to when Sgt. Otero-Camacho shot one time. SUMF ¶ 23. Sgt. Otero-Camacho fired a single shot to stop Shird before Shird could shoot others because he reasonably believed Shird posed a threat of serious physical harm to children, adults, and himself. *Id*. ¶¶ 15–22.

This case is similar to that warranting qualified immunity in *Ridgeway v. City of Woolwick Twp. Police Dep't*, 924 F. Supp. 653 (D.N.J. 1996). In *Ridgeway*, an officer shot a suspect in the back while fleeing on foot after a vehicle pursuit. *Id*. at 655. The officer pursued Ridgway's vehicle with lights and sirens activated after hearing a radio broadcast about a robbery. *Id*. Ridgeway did not stop. *Id.* at 656. Ridgeway intentionally struck the officer's vehicle causing it to flip on its side. *Id.* Ridgeway then fled on foot after "lean[ing] over in his car toward the floor of the passenger's side before getting out, in a manner consistent with an

12

attempt to locate a weapon." *Id.* The officer fired 10–20 rounds at Ridgeway as he fled. *Id.* On summary judgment, the court found the force reasonable. *Id.* at 658–59. That officer "could reasonabl[y] conclude that Ridgeway was not likely to submit to police authority, and that he would take evasive measures to avoid capture." *Id.* at 658. The officer could also reasonably conclude Ridgeway would be willing to use the weapon to cause harm "[g]iven that Ridgeway openly had exhibited a total willingness to commit dangerous acts against police officers and given his apparent disregard for innocent bystanders–as demonstrated in the suspected robbery and as displayed by the high speeds he drove and his failure to obey traffic signals. . . ." *Id.* "In sum, Ridgeway had demonstrated to [the officer] that he was the type of person with a dangerous disposition who would cause fatal injury to others, and it was objectively reasonable [] to make a split-second determination in the heat of the moment that deadly force was necessary to stop Ridgeway." *Id.*

Like the officer in *Ridgeway*, Sgt. Otero-Camacho had reason to believe deadly force was necessary. Sgt. Otero-Camacho considered Shird as having potentially engaged in dangerous, felony-level misconduct, being armed with a handgun, and having shown no intent to submit to police authority. SUMF ¶¶ 1–18. While fleeing, he ran through a park of children and adults near a bounce house.  *Id.* ¶ 19. Sgt. Otero-Camacho made the split-second decision to shoot once to protect public safety. *Id.* ¶¶ 19–23. This decision was objectively reasonable, so there was no constitutional violation.

## II.    <u>Supplemental Jurisdiction Over the Common Law Claims is Appropriate.</u>

The Court should exercise supplemental jurisdiction over the common law claims. The Fourth Amendment claim brought under 42 U.S.C. § 1983 involves a federal question, so this court has original jurisdiction. *See* 28 U.S.C. § 1331 ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The claims all rise out of the same facts and circumstances surrounding an encounter on July 30, 2022. *See* SUMF ¶ 23. It would waste judicial resources to remand to Superior Court for the common law claims when the record is complete before this Court. Once the Court rules on Sgt. Otero-Camacho's entitlement to qualified immunity, it should exercise supplemental jurisdiction to rule on the remaining claims. As argued below in Section III, Sgt. Otero-Camacho's right to the qualified privilege on the battery claim involves the same analysis as qualified immunity. *See Leach v. District of Columbia*, No. 19-CV-00947 (APM), 2025 WL 3715006, at *6 (D.D.C. Dec. 23, 2025). That decision is well within this Court's remit.

Neither the battery claim nor the negligence claim involves novel or complex state law concepts better suited for state court. This motion discusses the well-established legal principles governing the common law claims. And the issues raised in these claims are inextricably intertwined with the Fourth Amendment claim. Thus, interests of judicial economy, convenience, and fairness weigh in favor of supplemental jurisdiction to decide the common law claims.

### III.   <u>Qualified Privilege Bars the Battery Count.</u>

Battery fails here because Sgt. Otero-Camacho is entitled to qualified privilege. His use of force against Shird was objectively reasonable under the circumstances, and Sgt. Otero-Camacho subjectively believed he used no more force than necessary.

"A police officer may have a qualified privilege in an assault and battery case." *Scales*, 973 A.2d at 730. "The officer's judgment is to be reviewed from the perspective of a reasonable officer on the scene, with allowance for the officer's need to make quick decisions under potentially dangerous circumstances." *Id.* (citation modified). "Thus, the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must

14

subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id.* "To evaluate whether qualified privilege applies, District of Columbia courts use the same objective reasonableness standard applicable to qualified immunity under § 1983." *Bushrod*, 521 F. Supp. 3d at 29. The qualified privilege analysis "mirrors the qualified-immunity inquiry." *Leach*, 2025 WL 3715006, at *6 (citing *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998)) (citation modified).

Here, Sgt. Otero-Camacho subjectively believed that the force was reasonable—and, as discussed in Section I.B above, he was correct. *See, e.g.*, SUMF ¶¶ 17, 19–22. Sgt. Otero-Camacho pursued Shird's vehicle, believing it was connected to a recent shooting. SUMF ¶¶ 2–9. Shird fled, drove the wrong way on Madison Street, crashed into a curb, and ran into the crowded park with a bounce house set up for a gathering involving children. *Id.* ¶¶ 6, 10–19. Shird, who Sgt. Otero-Camacho reasonably believed was armed, ran near the bounce house for children and families after appearing to retrieve something inside the driver's side of the Kia Optima. *Id.* ¶¶ 8, 14–19. Sgt. Otero-Camacho, fearing for the safety of those bystanders and himself, used force to stop him. *Id.* ¶¶ 20–22. This action is properly protected by qualified privilege. *See Bushrod*, 521 F. Supp. 3d at 30 (qualified immunity for an officer who shot a fleeing car "for the same reasons [he is] immune from constitutional liability."); *Evans-Reid v. District of Columbia*, 930 A.2d 930, 939 n.10 (D.C. 2007) (qualified privilege for officer who shot juvenile who had BB gun because it "[l]ooked like a semi automatic handgun") (citation modified); *Wolfe v. United States Dep't of Homeland Sec.*, No. 19-5330, 2020 WL 7017861, at *1 (D.C. Cir. Sept. 17, 2020) (qualified privilege for officer who tased suspect who "had previously resisted the officer's orders and did not comply with verbal commands just prior to

15

the officer's use of his Taser"); *Leach*, 2025 WL 3715006, at *6 (qualified privilege for officers who shot and struck armed suspect because they "they were concerned Plaintiff might have another weapon and that he posed a threat until he was handcuffed.").

This qualified privilege bars the battery claim, and summary judgment should be entered in favor of Sgt. Otero-Camacho on Count IV.

## IV.     The Negligence Count Fails.

The negligence claim fails (1) without an established standard of care; (2) without negligent acts or omissions by Sgt. Otero-Camacho that proximately caused Shird's death; and (3) without negligence allegations distinct from the intentional tort of battery. The claim also fails based on the affirmative defense of contributory negligence.

### A.     Plaintiff Failed to Establish the Standard of Care for Negligence.

Sgt. Otero-Camacho is entitled to summary judgment on negligence as a matter of law because Plaintiff's police practices expert failed to relate the operative legal standard, specifically, the "objectively reasonable" standard articulated in *Graham*, to practices generally followed by other comparable police departments and applied to similarly situated officers, or to some standard nationally recognized by such organizations as governing the conduct of similarly situated officers. 490 U.S. at 387.

Expert testimony is needed to establish the standard of care for this negligence case. *See Varner v. District of Columbia*, 891 A.2d 260, 267 (D.C. 2006) ("[E]xpert testimony is required to establish the standard of care in negligence cases such as this one, which involve issues of safety, security and crime prevention.").

Where expert testimony is necessary, "the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured." *Clark v. District of*

16

*Columbia*, 708 A.2d 632, 635 (D.C. 1997) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)) (emphasis in original). "Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities or to some standard nationally recognized by such units." *Clark*, 708 A.2d at 635 (collecting cases where expert testimony failed to establish any standard of care). "To establish a national standard of care, an expert must do more than rely on his own experience or 'simply . . . declare that the District violated the national standard of care.'" *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 258 (D.D.C. 2018) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001)). "Rather, the expert 'must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions.'" *Butera*, 235 F.3d at 659 (citing *Scott v. District of Columbia*, 101 F.3d 748, 758 (D.C. Cir. 1996)). The expert must provide references to practices in fact followed by comparable police departments, or refer to a standard nationally recognized by comparable police departments so the jury can evaluate the standards governing similarly situated police officers. *See Clark*, 708 A.2d at 635; *accord Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 110–112 (D.D.C. 2011) (granting summary judgment on negligence claim against individual police officer based on a shooting because the plaintiff's police practices expert did not furnish evidence of an applicable standard of care, or a deviation from it).

Mancini does not meet this bar. In the "Analysis" section of his report, Mancini states: "In my opinion, this is a violation of the standard of care that a reasonable officer under similar circumstances would have used." SUMF ¶ 27. Mancini's opinion is a legal conclusion about whether Sgt. Otero-Camacho's actions complied with the Supreme Court precedents of *Graham*, 490 U.S. at 386, and *Garner*, 471 U.S. at 11. SUMF ¶¶ 26, 28. Otherwise, he relies only on

17

Metropolitan Police Department General Order 901.07 (2022) (MPD Use of Force Policy), Department of Justice Policy On Use Of Force, 1-16.000 (DOJ Policy), and a publication by a think tank, the Police Executive Research Forum (PERF) publication, *Guiding Principles on Use of Force* (2016) (PERF document). *Id*. ¶¶ 29–37.

The cited sections of the MPD Use of Force Policy, however, are MPD factors to be considered when determining the appropriate level of force. *Id*. ¶¶ 29–32, 41. These types of internal police guidelines, however, create no rights enforceable by the public and do not establish a standard of care. *See, e.g.*, *Jackson v. District of Columbia*, No. 23-CV-922 (CRC), 2024 WL 2131761, at *4 (D.D.C. May 13, 2024) (quoting *Rice v. District of Columbia*, 715 F. Supp. 2d 127, 132 (D.D.C. 2010)) ("Ultimately, though, 'liability only attaches if the police were negligent with regard to a *national* standard of care.'") (emphasis in original); *accord District of Columbia v. Walker*, 689 A. 2d 40, 47 n. 13 (D.C. 1996) (finding that jury can consider general order, but liability can only be found if the officers violated a standard of care).

Similarly, the DOJ Policy states, "law enforcement and correctional officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person." SUMF ¶¶ 33–35, 42. The PERF document essentially just states that an officer facing a criminal suspect who is threatening the public or an officer with a gun has limited options besides deadly force. *Id*. ¶¶ 36–37, 43.

Not one of those sources provide insight into the practices generally followed by other comparable police departments to govern the actions of similarly situated officers, or shed light on what national standard governs those police actions. They do not refer to commonly used police procedures or identify specific standards so the jury could measure Sgt. Otero-Camacho's

18

actions. Without this critical measuring stick for what is reasonable, a jury cannot assess whether Sgt. Otero-Camacho's conduct deviated from the operative national standard. This fatal deficiency entitles Sgt. Otero-Camacho to summary judgment for negligence.

Mancini's deposition also failed to establish any national standard of care. Mancini cited his own experience multiple times, but not a national standard. *Id*. ¶ 40. Experience does not substitute for the national standard. *Messina*, 663 A2d at 538 (finding expert testimony insufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances). Nor is Mancini's experience on point. He spent his career in a single jurisdiction—Boston. SUMF ¶ 39. That experience in a different city cannot establish the national standard of care, and in any event one example is insufficient as a matter of law. *See Butera*, 235 F.3d at 659 (citing *Clark*, 708 A.2d at 635) ("To establish a national standard of care, an expert must do more than rely on his own experience or 'simply . . . declare that the District violated the national standard of care.'"); *accord Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C. 1988) (describing single example as "plainly insufficient" to articulate applicable standard of care) (collecting cases). Since Mancini's testimony does not articulate and reference a national standard of care, Sgt. Otero-Camacho is entitled to summary judgment. *See Clark*, 708 A.2d at 635 (finding directed verdict proper where expert failed to clearly relate standard of care).

### B.      Plaintiff Cannot Show Causation as a Matter of Law.

An intervening intentional act breaks the chain of proximate cause unless reasonably foreseeable. *See, e.g.*, *McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708, 711 (D.C. 1991). Here, it was not reasonably foreseeable that Shird would flee Sgt. Otero-Camacho; that Shird would abandon his vehicle and flee from police while Sgt. Otero-Camacho

19

reasonably believed him to be armed; and that Shird's flight would take him into a public park near numerous bystanders, including children near a bounce house. SUMF ¶¶ 10–20. Each of Shird's actions following Sgt. Otero-Camacho's initial attempt to pull him over broke the chain of proximate cause because they were unpredictable and unforeseeable. Therefore, negligence fails as a matter of law. *See Hundley v. District of Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007) ("it cannot be said that Officer Gaines's negligence in approaching Hundley proximately caused the shooting death of Hundley. . . . Rather, it was Hundley's intervening intentional misconduct that caused Officer Gaines's intervening shooting, which in turn caused the death of Hundley.") (citation modified).

Moreover, under District law, a police officer owes no duty to an unimpaired adult—meaning someone who the officer has no reason to believe is mentally disturbed, unstable, or under the influence of mind-altering drugs—to dissuade that individual from aggressively resisting arrest. *Hundley*, 494 F.3d at 1105 (finding no duty where "[n]o evidence suggests that Hundley was mentally ill at the time of the stop, or that Officer Gaines knew or should have known as much."). When determining causation, the evidentiary presumption is that an individual will obey the law. *Majeska v. District of Columbia*, 812 A.2d 948, 951 (D.C. 2002) ("There is a general proposition that an individual is presumed to exercise reasonable care and obey the law.").

Shird was legally required to comply with Sgt. Otero-Camacho's orders. 18 DCMR § 2000.2 ("No person shall fail or refuse to comply with any lawful order or direction of any police officer, police cadet, or civilian crossing guard invested by law with authority to direct, control, or regulate traffic."). A duty of care cannot exist in a vacuum—a cognizable duty arises out of a duty to protect the interests of the injured party. "One of the essential elements of a

20

cause of action in negligence is that the conduct complained of invaded some interest of the plaintiff which, by virtue either of statute or of the common law, is entitled to protection as against the defendant." *Woolridge Mfg. Co. v. United States*, 235 F.2d 513, 513 (D.C. Cir. 1956) (citing 2 Restatement, Torts, § 281 (1934)).

In other words, "the rule is that the plaintiff must allege facts which show that the defendant breached some legally imposed duty owed to the plaintiff." *Id.* District law does not recognize any "legally imposed duty" to protect an unimpaired adult from the consequences of his own aggressive conduct.

Shird was the aggressor. There is no evidence that he was impaired. *See generally* SUMF. He refused to pull over when followed by a marked police cruiser with emergency equipment activated. *Id.* ¶¶ 9–11. He led Sgt. Otero-Camacho on a police chase and travelled against traffic before crashing into a curb. *Id.* He ditched the Kia Optima and fled into a public park with children near a bounce house and adult bystanders. *Id.* ¶¶ 13–19. Shird continued running and refused to stop even when Sgt. Otero-Camacho yelled "GUN! GUN! GUN! GUN! GUN!" *Id.* ¶¶ 20–21. "[T]his case is governed by general principles of tort law: It was not legally foreseeable that [Shird] would threaten Officer [Sgt. Otero-Camacho] as a result of Officer [Sgt. Otero-Camacho's] initial stop—and the stop therefore cannot be a proximate cause of [Shird's] death." *Hundley*, 494 F.3d at 1105 (brackets added).

## C.    *Chinn* Bars the Negligence Count.

A negligence claim fails unless based on a theory separate from a related intentional tort. *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003) (discussing need for "at least one distinct element, involving an independent breach of a standard of care . . . ."). *Chinn* is regularly invoked under District law to resolve negligence claims arising from the

same allegations as intentional tort claims. *See, e.g.*, *Jiggetts v. Cipullo*, No. CV V17-380 (JMC), 2025 WL 958311, at \*25 (D.D.C. Mar. 31, 2025) (dismissing negligence claims under *Chinn*); *Marsh v. Bewley*, No. 24-CV-683 (RDM), 2025 WL 947518, at \*3 (D.D.C. Mar. 28, 2025) (same).

This case involves battery and negligence each arising from the shooting. *See* Am. Compl. [1-10]. Without describing a "distinct element," Plaintiff cannot simultaneously pursue battery and negligence. *Chinn*, 839 A.2d at 707. "[W]here the battery began with the clear intent of the officers to initiate a seizure, the battery did not transmogrify into negligence by the fact that the officers may have in the process mistakenly crossed the line of permissible force." *Id.* at 711. "Any 'negligence' was inherent in the battery itself, which remained a battery but now unprivileged." *Id. See also Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000) (quoting *United States Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir. 1993) ("In other words, a plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments' of another, here negligence.")). But that is exactly what Plaintiff has done, which runs afoul of *Chinn* and its progeny. *Marsh*, 2025 WL 947518, at \*3. Summary judgment is appropriate.

### D.    Shird was Contributorily Negligent as a Matter of Law.

Shird's contributory negligence bars the negligence count. Where a reasonable jury can find only one way, summary judgment is appropriate for the issue of contributory negligence. *See Stotmeister v. Alion Sci. & Tech. Corp.*, 65 F. Supp. 3d 56, 72 (D.D.C. 2014) (citation modified).

Here, Shird fled a marked police cruiser with emergency equipment activated while traveling in the wrong lane and crashed into a curb. SUMF ¶¶ 6, 10–11, 44. His erratic and

dangerous behavior continued when he fled on foot while ignoring a uniformed police officer shouting "GUN! GUN! GUN! GUN! GUN!" *Id*. ¶¶ 17-21. Shird ran into a crowded park close to where children and adults were gathering near a moon bounce. *Id*. ¶ 19.

Before he was shot, Shird had multiple opportunities to heed police commands to halt. *Id.* ¶¶ 10–11, 18–22. His failure to do so in conjunction with these other dangerous actions was a failure to exercise reasonable care for his own safety. *Id.* ¶¶ 19–25. These undisputed facts render him contributorily negligent as a matter of law. *See Sci. & Tech. Corp.*, 65 F. Supp. 3d at 92 (granting summary judgment in favor of defendant on issue of contributory negligence where the preponderance of evidence shows plaintiff's negligence contributed to his injuries and death); *see also Washington Metro. Area Transit Auth. v. Young*, 731 A.2d 389, 394 (D.C. 1999) ("In the District of Columbia, a plaintiff in a negligence action generally cannot recover when he is found contributorily negligent."); *accord Felton v. Wagner*, 512 A.2d 291, 296 (D.C. 1986) ("contributory negligence is an absolute bar to recovery in a negligence action").

## V.      **<u>Wrongful Death and Survival Act are not Independent Claims.</u>**

Counts II and III under the Wrongful Death Act and Survival Act are not independent claims. Consequently, they fall along with Counts I, IV, and V. *See, e.g.*, *Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 227 (D.D.C. 2018) ("[N]either statute provides any substantive rights; they simply establish the procedural methods for filing suit.") (citation modified); *Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 87 (D.D.C. 2012) (explaining Wrongful Death Act and Survival Act "do not provide any independent causes of action."). Thus, summary judgment in favor of Sgt. Otero-Camacho is appropriate for all counts.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment should be granted.

23

Dated: January 30, 2026                    Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Charles J. Coughlin*
CHARLES J. COUGHLIN [1016993]
Chief, Section IV

*/s/ Christopher Pantel*
CHRISTOPHER PANTEL [483073]
KRISTIN M. WILLSEY [90026203]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C.  20001
202-746-7693
202-741-0588 (fax)
christopher.pantel@dc.gov
*Counsel for Defendant Reinaldo Otero-Camacho*

24